Filed 5/12/25  P. v. Rodriguez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SAMUEL JAMES RALPH RODRIGUEZ,<br><br>Defendant and Appellant. | F086614<br><br>(Super. Ct. Nos. MCR060295A,<br>MCR063100)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Erin Doering, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

This appeal involves two cases that were consolidated and tried together, one based on events that occurred on August 28, 2018, and one based on events that occurred on January 2, 2022.  On May 18, 2023, Rodriguez was convicted of, among other

things: attempting to murder R.C., based on the 2018 events; and assaulting A.C. with a deadly weapon, based on the 2022 events. On appeal, Rodriguez argues: 1) there is insufficient evidence to support the specific intent element of his attempted murder conviction; 2) the trial court abused its discretion and violated Rodriguez's right to due process by allowing the 2018 charges and the 2022 charge to be tried together; and 3) the trial court violated Rodriguez's right to due process and a fair trial by ordering he be shackled during the trial. The People disagree. We affirm.

## PROCEDURAL HISTORY

The Madera County District Attorney charged Rodriguez in three separate cases, Madera Superior Court case Nos. MCR060295A, MCR063100, and MCR073546. On August 12, 2022, the prosecutor filed a motion to consolidate case Nos. MCR060295A and MCR073546. Rodriguez opposed the motion. On September 2, 2022, the trial court granted the motion and ordered that case No. MCR060295A be the leading case.[1]

On September 19, 2022, the prosecutor filed a consolidated third amended information in case No. MCR060295A, charging Rodriguez with willful, deliberate, and premeditated attempted murder (Pen. Code,[2] §§ 664, 187, subd. (a); counts 1, 2); mayhem (§ 203; counts 3, 7); criminal threats (§ 422, subd. (a); count 4); attempted arson (§ 455; count 5); assault with a deadly weapon (§ 245, subd. (a)(1); counts 6, 9); assault with caustic chemicals (§ 244; count 8); and misdemeanor possession of tear gas by a prohibited person (§ 22810, subd. (a); count 10).

---

[1] Case No. MCR063100 was not consolidated with case No. MCR060295A, and defendant filed a notice of appeal in both cases. However, Rodriguez makes no claims of error regarding case No. MCR063100. Accordingly, we treat any contentions regarding case No. MCR063100 as forfeited. (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues" forfeited].)

[2] All further undesignated statutory references are to the Penal Code.

Prior to a jury being selected, the prosecutor requested that Rodriguez be shackled during the trial. After holding a hearing, the trial court granted the request.

On May 18, 2023, Rodriguez was found guilty by a jury on counts 1, 4, 6, 7, 9, and 10. The jury found Rodriguez not guilty on counts 2, 5, and 8. As to count 1, the jury found not true the allegation that the offense was willful, deliberate, and premediated. As to count 3, the jury found Rodriguez not guilty of mayhem, but guilty of the lesser included offense of attempted mayhem.

On May 19, 2023, Rodriguez pled guilty to one count of battery of a custodial officer (§ 243.1) in case No. MCR063100.

Rodriguez was sentenced on July 10, 2023. The trial court imposed an aggregate term of 33 years, eight months. On that same day, Rodriguez timely filed a notice of appeal in Case Nos. MCR060295A and MCR063100.

## FACTUAL SUMMARY

**The Prosecution's Case**

<u>2018 Incidents Involving R.C. and J.M.</u>

Rodriguez had been A.H.'s boyfriend. While they were dating, he would regularly stay at her house.

On August 28, 2018, Rodriguez was at A.H.'s house. After she got home from work, he told her that they needed to leave because he had "a bad feeling there and … there [were] demons there[.]"

They drove to a nearby store in A.H.'s vehicle. She had a sunshade in the vehicle that she usually kept on the floorboard of the front passenger seat. She also kept a pocketknife and pepper spray in the center console.

A.H. went into the store. When she exited the store, Rodriguez and her vehicle were gone. He came back about 15 minutes later, driving her vehicle.

Eventually, A.H. got into the front passenger seat and yelled at Rodriguez. Rodriguez drove toward his mother's house, and she continued yelling at him. He did

3.

not respond, which she thought was strange. He was also driving "very fast," which scared her.

Rodriguez turned onto a dirt road. At some point he slowed down enough that A.H. was able to grab the gear shift and put the vehicle in park. She got out and started running. Rodriguez continued driving toward his mother's house.

Eventually, A.H. saw Rodriguez approaching her in her vehicle. Rodriguez repeatedly apologized and told her to get back in the vehicle, but she did not respond and kept walking away. She did not see Rodriguez or her vehicle again that day.

That day, R.C. was walking down a road. Rodriguez pulled over and asked him if he wanted a ride. R.C. had met Rodriguez once before, and he got in the vehicle. Rodriguez began driving.

Almost immediately after R.C. got in, Rodriguez started acting "crazy." Rodriguez repeatedly asked him "random questions," including what his name was, where he was from, and how many kids he had. Rodriguez stated that "there was a fight between good and evil." Rodriguez would sporadically drive "really fast," and he "was not keeping his eyes on the road." Rodriguez's voice would change, and it sounded "like he was going to be violent."

Eventually, Rodriguez turned on a dirt road that led to his mother's house. While driving on the dirt road, Rodriguez "seemed like he was trying to ask" R.C. whether he was on the side of good or evil. R.C. answered, and in response Rodriguez sprayed him in the face with bear mace.

R.C.'s eyes were burning, and he was crying uncontrollably. He asked Rodriguez why Rodriguez sprayed him, but Rodriguez did not respond. Shortly after that, Rodriguez wrapped a "shiny aluminum-looking windshield visor thing" around him and he felt a sharp pain in his neck. He realized that Rodriguez was cutting him. Rodriguez cut both sides of his neck.

4.

R.C. got out of the vehicle and ran.  Blood was squirting from the left side of his neck.  He went into the first house he saw, which was Rodriguez's mother's house.  Rodriguez came into the house "[f]or a split second," but then he left.

Eventually, R.C. was taken to a hospital, where he got over 100 stiches in his neck.  A detective with the Madera County Sheriff's Office was dispatched to the hospital where he observed that R.C. had two large lacerations on his neck.  "[O]ne was about 15 inches long [and] anywhere from 1 to 2 inches wide."  The other was approximately eight inches long.

On that same day, J.M. returned home from work a little after 7:00 p.m. and went inside his residence.  A short time later, he saw someone he did not know (later identified as Rodriguez) approaching his truck.  Rodriguez jumped into the back of the truck and rummaged around.

J.M. asked Rodriguez what he was doing.  Rodriguez did not answer.  Instead, he grabbed a gas can from the back of the truck and poured gas on J.M.  He pulled out a lighter and tried to set J.M. on fire, but the lighter would not spark.  He then "look[ed] for another match or something" so he could light J.M. on fire.

After that, Rodriguez went toward a pile of nearby firewood.  As Rodriguez moved toward the pile, J.M. kicked the gas can and the lighter out of Rodriguez's hands.  J.M. did not know if he also kicked Rodriguez's hands.

J.M. started to walk back to his residence, but he stopped and looked at Rodriguez.  At about the same time, J.P., who lived in a barn near J.M.'s residence, approached and stood between J.M. and the back door to J.M.'s residence.  J.P. was holding a machete.  J.P. told J.M. that he " 'better run,' " and Rodriguez repeatedly told J.M. that he was going to kill him.

At some point, Rodriguez started hitting J.M. and J.M. defended himself.  Rodriguez picked up a wooden bar stool and repeatedly swung it at J.M.  Rodriguez hit J.M.'s face, head, shoulders, and back.  J.M. fell after he was hit two or three times.

5.

However, Rodriguez did not stop hitting him until the bar stool broke.  While J.M. was being hit he tried to block the bar stool and grab it, but it broke his thumb.

J.M. tried to run, but he was having trouble standing up.  Rodriguez grabbed him, and he fell.  Rodriguez started hitting him again.  During this altercation, Rodriguez tried to poke J.M.'s eyes out and J.M. bit one of Rodriguez's fingers.  At some point, Rodriguez stopped hitting J.M. while J.P. held a machete to J.M.'s face and started kicking J.M.'s right leg.

Eventually, J.M. kicked Rodriguez off him and got up.  Rodriguez's phone had fallen out of his pocket during the altercation, and J.M. had picked it up.  Rodriguez demanded that J.M. give it back, but J.M. threw it instead.  Shortly afterward, J.P. told Rodriguez they needed to leave because the police were coming, and they left the area.

During the incident J.M.'s phone broke, so he was not able to call 911.  The following morning, J.M. drove to his brother's house, and his brother called law enforcement.

An officer responding to the call observed the following injuries:  "[b]oth of [J.M.'s] eyes had discoloration and bruising.  He had bruising and contusions on the top and back of his head.  He had what appeared to be dry -- a cut and dried blood on the back of his head.  He had a cut on his nose.  It was approximately a quarter of an inch in length.  His left eye was bloodshot red."  The officer also observed that J.M. had bruising on his back, his thumb "was bent and appeared to have been broken,"[3] and he had "what appeared to … be a bite mark on the right side of his chest."  The responding officer also collected the shirt J.M. was wearing, which smelled like gasoline.

---

[3] A radiologist who reviewed an MRI of J.M.'s right hand later testified that while J.M. had a bone bruise, swelling, and inflammation around the base of his thumb, there were no fractures.  However, according to one of the emergency room physicians that treated J.M., his thumb had been dislocated.

Sometime later, Rodriguez and R.C. were in custody at the Madera County Department of Corrections. They were transported to court in the same van. Rodriguez apologized to R.C., saying, "Sorry. Got the wrong person." He also asked R.C. if R.C. was going to testify against him.

Incident Involving A.C.

On January 2, 2022, Rodriguez was an inmate at Madera County Jail. Rodriguez was housed in Module E, a maximum-security module where only one inmate is allowed out of his cell at a time.

At about 1:00 p.m., when Rodriguez was out of his cell, A.C.'s cell door was opened by mistake. A correctional officer ordered A.C. to close the door, and multiple correctional officers ordered Rodriguez to go back into his cell. However, neither obeyed. Instead, Rodriguez "unfolded his shoes," approached A.C.'s cell, and began talking to A.C.

Rodriguez then "paced back from the door," which allowed A.C. to come out of his cell. Rodriguez also took his glasses off. A.C. came out of his cell and they both got into a fighting stance. Rodriguez then pulled out "a white sharp object."

They began fighting. During the fight, Rodriguez repeatedly stabbed A.C. with the "white sharp object."

Multiple correctional officers ordered them to return to their cells, but the incident did not end until after correctional officers deployed pepper spray and a "PepperBall."[4]

A.C. had, among other injuries, an open wound on the top of his head and open wounds on his back. He also had two cuts on his head and one on his left cheek. Rodriguez had "some markings on his left tricep [sic], inside of his elbow, and his lower back look[ed] a little red."

---

[4] According to Correctional Officer Samuel Gill, a "PepperBall" is "like a paintball gun, but instead of shooting balls filled with paint, it's … a PAVA powder. It's an irritant." The powder disperses upon impact.

Correctional officers were not sure who initiated the fight, but one heard Rodriguez say " 'We can get this on right now' " at around the time he backed away from A.C.'s door.

A video of the incident, which did not include audio and did not capture the entire altercation, was played for the jury.

**Rodriguez's Case**

Rodriguez called A.C. as a witness. According to A.C., on January 2, 2022, his cell door opened. Rodriguez approached and told him not to come out of his cell. He came out anyway because he wanted to attack Rodriguez, and they began fighting. A.C. tried to hit Rodriguez first, but he could not. Additionally, Rodriguez did not use a weapon during the altercation and A.C. did not have any puncture wounds on his back.

Rodriguez also testified on his own behalf. As to the incident involving A.C., Rodriguez testified that he heard a door open, but he did not know it was a cell door until A.C. said that his door had opened. Rodriguez approached and told A.C. not to come out of his cell. However, A.C. came out of his cell and attacked Rodriguez. Rodriguez defended himself with "a metal plating to an electronic socket." After A.C. no longer posed a threat to him, he went back to his cell.

As to the incidents that occurred on August 28, 2018, Rodriguez testified that he was driving A.H.'s vehicle when he saw a man, later identified as R.C., walking on the road. He offered to give R.C. a ride, and R.C. accepted. During the drive, Rodriguez made "small talk" with R.C. He also asked R.C. if R.C. was a good person because he had to get his ID from his mother's house, and he did not want to bring a bad person to his family.

After getting his ID, Rodriguez got back into the vehicle and started driving. As he was driving, he noticed that his marijuana and THC oil were missing from the console area. He looked for it, but he could not find it.

8.

So, he grabbed a box cutter that was in the vehicle, held it to R.C.'s neck, told R.C. not to move, and tried to "pat [R.C.] down" in order to get the items back. However, R.C. pulled away and punched him. R.C. then tried to cover him with a sunshade. He tried to move the sunshade and he grabbed R.C., but R.C. got out of the vehicle and ran toward Rodriguez's mother's house.

Rodriguez did not attack R.C. with bear spray and he did not intend to cut R.C.'s throat. In fact, he did not notice that R.C. was bleeding until after he followed R.C. into his mother's house.

Later, Rodriguez went to the loft where J.P. lived. After a couple hours, Rodriguez went downstairs and started to get into the back of a truck that was not there when he arrived. As he was climbing in, he heard someone say, " 'What the f**k are you doing? Who are you?' "

Rodriguez looked and saw an individual who was later identified as J.M. He jumped off the truck, and J.M. approached him in an aggressive manner. They then began punching each other. Eventually, they both went to the ground, where the fighting continued. Both tried to get on top of the other, but Rodriguez succeeded.

J.P. approached with a stick and told them to stop. They stopped. As Rodriguez was getting off J.M., J.M. kicked him and "started coming back after [him]."

J.M. and Rodriguez started fighting again. J.M. bit Rodriguez's finger. Rodriguez could not get his finger out of J.M.'s mouth, so he bit J.M. back. At that point J.M. let go of his finger.

Rodriguez ran to a nearby patio and J.M. followed. Rodriguez picked up a bar stool and told J.M. to stay away. However, J.M. advanced. He hit J.M. with the bar stool and then used it to push J.M. over. He told J.M. to stay down, but J.M. tried to get back up. So, he hit J.M. with the bar stool again. The bar stool broke after the hit, and he quickly walked away. He did not pour gas on J.M., threaten to kill J.M., or attempt to gouge J.M.'s eyes out.

**DISCUSSION**

## I. Substantial Evidence Supports the Attempted Murder Conviction

Rodriguez argues there was insufficient evidence to show that he had the specific intent to kill R.C. The People disagree.

### A. *Applicable Law and Standard of Review*

" '[A]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) "[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*Id.* at p. 741.) "Whether a defendant possessed the requisite intent to kill is … a question for the trier of fact." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1552 (*Gonzalez*).)

When evaluating a sufficiency of the evidence claim, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "The test for evaluating a sufficiency of evidence claim is deferential[.]" (*People v. Flores* (2020) 9 Cal.5th 371, 411 (*Flores*).) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Flores*, at p. 411.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens*, at p. 508.)

## B. Analysis

Rodriguez's arguments are not persuasive. They largely rely on viewing the evidence in the light most favorable to him instead of the light most favorable to the judgment. For example, Rodriguez argues that the jury could not have found he had the intent to kill R.C. because "the evidence presented to the jury reflected that Rodriguez was talking and acting 'crazy,' had delusional thinking, and had been smoking marijuana that morning."

However, there is no evidence in the record suggesting that smoking marijuana in the morning prevented Rodriguez from forming an intent to kill later in the day. There is also no expert testimony suggesting that any mental health issues prevented him from forming an intent to kill.

Moreover, there is evidence that Rodriguez was not acting "crazy" and did not have delusional thinking. First, an officer who encountered Rodriguez on the night of the incident testified that he did not hear or see anything suggesting that Rodriguez was acting "crazy." More importantly, Rodriguez's own testimony supports the jury's finding. Rodriguez testified that he normally drives fast and that he was not talking "crazy" to R.C. Instead, he was making small talk and trying to make sure R.C. was a good person because he was going to bring R.C. near his family. Additionally, he testified that he pulled a knife on R.C. because items were missing after he left R.C. alone in the vehicle, he thought R.C. had stolen from him, and he wanted to get the items back. Thus, from Rodriguez's testimony, a jury could reasonably conclude that R.C. was acting rationally, and not delusional or "crazy," at the time he slit R.C.'s throat.

As another example, Rodriguez argues that R.C. testified "he had a sunshade over him such that Rodriguez would not have been able to discern where the cuts were directed." However, R.C. testified that the only part of his body that he was sure was covered by the sunshade was the back area of his neck. From this testimony, the jury could have reasonably concluded that Rodriguez could still see portions of R.C.'s neck.

11.

Moreover, even if the sunshade did cover R.C.'s entire neck, given that he testified he was in the passenger seat and it was Rodriguez who placed the sunshade over him, the jury could have reasonably concluded that Rodriguez still knew the location of R.C.'s neck.

Thus, even if we believed that the evidence is susceptible to the interpretations advanced by Rodriguez, his argument still fails. " 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's finding, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357–358; see also *People v. Lee* (2011) 51 Cal.4th 620, 632 [" 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' "]; *Flores*, *supra*, 9 Cal.5th 371, 411 ["We must … 'accept logical inferences that the jury might have drawn from the circumstantial evidence' "].)

Applying the appropriate standard, substantial evidence supports the jury's finding that Rodriguez had the specific intent to kill. R.C. testified that Rodriguez offered him a ride, and he got in the vehicle. While he was in the vehicle, Rodriguez sprayed him in the face with bear mace. This caused his eyes to burn and uncontrollable crying. Shortly afterward, Rodriguez wrapped a sunshade around him and cut his neck.

Additionally, much of R.C.'s testimony is corroborated by other evidence. Rodriguez admitted that he gave R.C. a ride. Rodriguez's ex-girlfriend testified that she

kept a pocketknife and pepper spray in the center console of her vehicle, which was the vehicle Rodriguez was driving when he gave R.C. a ride. The vehicle was recovered, and an officer testified there was "a large amount of dried blood on the vehicle." Blood taken from various spots was tested by a senior criminalist, and he determined it "was the same as the reference profile of [R.C.]" A can of pepper spray was also recovered from the vehicle. Finally, an officer testified that he saw R.C. in the hospital on the day of the incident, and R.C. had two large lacerations on his neck.

The evidence that Rodriguez pepper sprayed R.C. and then cut his neck in two places is, by itself, substantial evidence that supports the jury's intent to kill finding. In *People v. Williams* (2018) 23 Cal.App.5th 396, the court held that, "[a]lthough not a compelled inference, [a] jury could rationally find that two stabs to the neck is a method of killing that 'was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" ' to kill." (*Id.,* at p. 412;[5] see also *Gonzalez, supra,* 126 Cal.App.4th at p. 1552 [the "appellant's intent [to kill] was established by the evidence of his unprovoked attack that rendered the unarmed victim prone and defenseless as appellant repeatedly stabbed him with a shank he had hidden in his boxers"]; *People v. Avila* (2009) 46 Cal.4th 680, 701–702 [evidence of the defendant's repeated attempts to stab the victim, who was unarmed and trapped, and the defendant's successful stabs to the victim's arm and leg, "alone [was] substantial evidence of [the] defendant's intent to kill"].) Accordingly, "the totality of the circumstances, including

---

[5] Rodriguez argues *Williams* is not on point because additional evidence was presented in that case. However, the fact that other evidence also supported the verdict does not change the court's holding that a jury can infer intent to kill from multiple stab wounds to the neck. Moreover, there is other evidence in the present case as well, including motive (the theft of Rodriguez's marijuana). We note that, like *Williams*, we do not hold that the jury was compelled to find an intent to kill, only that substantial evidence supports such a finding.

13.

the manner of the attack and the number and location of the penetrating knife wounds, [is] sufficient to support a finding of intent to kill." (*Gonzalez*, at p. 1552.)

Additionally, while "motive itself is not an element of [attempted murder]," "evidence of motive is often probative of intent to kill." (*Smith*, *supra*, 37 Cal.4th at pp. 740–741.) And here, there is evidence of a motive. Rodriguez himself testified that he believed that R.C. had taken his marijuana and THC oil, and in response, he pulled out a box cutter. This motive is also at least somewhat supported by R.C.'s testimony that Rodriguez later told him, "Sorry. Got the wrong person."

Accordingly, Rodriguez's claim that substantial evidence does not support the jury's intent to kill finding fails.

## II. The Trial Court Did Not Abuse Its Discretion or Violate Rodriguez's Due Process Rights by Allowing the 2018 Charges and the 2022 Charge to be Tried Together

Rodriguez argues that the trial court erred by granting the prosecutor's motion to consolidate the 2018 charges with the 2022 charge. He further argues that even if it was not an error to consolidate the charges, due to the risk of prejudice in trying these charges together, they should have been severed. The People disagree.

### A. Applicable Law

"Section 954 allows for the joint trial of 'two or more different offenses connected together in their commission ... or two or more different offenses of the same class of crimes or offenses.' " (*People v. Hin* (2025) 17 Cal.5th 401, 438 (*Hin*).) "[O]ffenses are 'of the same class' if they possess common characteristics or attributes." (*People v. Moore* (1986) 185 Cal.App.3d 1005, 1012.)

"Where joinder is proper under section 954, '[t]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.] In determining whether a court abused its discretion in declining to sever properly joined charges, we first 'consider the cross-

14.

admissibility of the evidence in hypothetical separate trials.' [Citation.] If the evidence is cross-admissible, then this 'is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' " (*Hin*, *supra*, 17 Cal.5th at pp. 438–439.)

"If we determine that evidence underlying properly joined charges would *not* be cross-admissible, we proceed to consider 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.] In making *that* assessment, we consider three additional factors, any of which—combined with our earlier determination of absence of cross-admissibility—might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citations.] We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state." (*People v. Soper* (2009) 45 Cal.4th 759, 775, fn. omitted (*Soper*).)

" 'Even if a defendant fails to demonstrate the trial court's joinder ruling was an abuse of discretion when it was made, reversal may nonetheless be required if the defendant can demonstrate that "the joint trial resulted in such gross unfairness as to amount to a due process violation." ' " (*Hin*, *supra*, 17 Cal.5th at p. 439.) The defendant bears the "high burden" of making this showing. (*Soper*, *supra*, 45 Cal.4th at p. 783.)

### B. Standard of Review

Whether a trial court properly joined charges under section 954 is a question of law subject to independent review. (*People v. Alvarez* (1996) 14 Cal.4th 155, 188.)

15.

"A defendant, to establish error in a trial court's ruling declining to sever properly joined charges, must make a ' "*clear showing of prejudice* to establish that the trial court *abused its discretion ....*" ' [Citation.] A trial court's denial of a motion to sever properly joined charged offenses amounts to a prejudicial abuse of discretion only if that ruling ' " ' " 'falls outside the bounds of reason.' " ' " ' " (*Soper*, *supra*, 45 Cal.4th at p. 774.) "In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.' " (*Ibid*.)

### C. Additional Background

On August 12, 2022, the prosecutor filed a motion to consolidate case Nos. MCR060295A and MCR073546 pursuant to section 954. Case No. MCR060295A involved the incidents that occurred on August 28, 2018. Case No. MCR073546 involved the incident that occurred on January 2, 2022. The prosecutor argued that the cases were connected in their commission and shared a common element. Rodriguez was charged with assault with a deadly weapon in both cases, Rodriguez attacked an unarmed victim in both cases, Rodriguez used a weapon to attack R.C., J.M., and A.C., and none of the victims provoked Rodriguez or attacked him first. The prosecutor further argued that the cases should be consolidated in the interest of judicial economy.

On August 31, 2022, Rodriguez filed an opposition to the prosecutor's motion, arguing that there was no nexus between the assaults that allegedly occurred on August 28, 2018, and the "jail fight" that allegedly occurred on January 2, 2022. Additionally, "[t]he alleged jail assault in [case No. MCR073546] is not the same offense or the same class of offense as the attempted murder, mayhem, criminal threat, and burning charges alleged in [case No. MCR060295A]."

On September 2, 2022, the trial court held a hearing on the motion. At the hearing, Rodriguez also argued that consolidating the cases would be unduly prejudicial. After hearing arguments from the parties, the court found that the offenses in both cases

16.

had "[c]ommon characteristics." They "share that same instrumentality – a stabbing weapon – they share that same method of execution, and they – both incidents involve violent attacks on victims, and, in both incidents, the … victims were unarmed." The court also found that, as to cross-admissibility, "an argument … can be made that they're admissible under [Evidence Code section 1101[, subdivision ](b) to establish intent, plan, knowledge, or absence of a mistake or accident." Accordingly, the court granted the prosecutor's motion.

### D. Analysis

Rodriguez first argues that it was error to join the charges stemming from the 2018 with the charge stemming from the 2022 case pursuant to section 954.

This argument fails. At the preliminary hearing regarding the 2018 charges, evidence was introduced that, without warning or reason, Rodriguez sprayed R.C. with mace. After that, Rodriguez tried to wrap a sunshade around him and then cut his neck. R.C. had cuts to both sides of his neck. Photographs of his injuries were introduced into evidence.

Evidence was also introduced that, on the same day, J.M. had recently come home from work when he saw Rodriguez in the back of his truck. Rodriguez was pouring gasoline on the truck, and he asked Rodriguez what he was doing. Then, without provocation, Rodriguez poured gasoline on him and tried to light him on fire with a cigarette lighter. However, the lighter did not work. Rodriguez then headed toward a pile of firewood, and J.M. kicked the gasoline can out of Rodriguez's hand. At some point he also took the lighter from Rodriguez. They then "had some words" and started fighting. Eventually, J.M. tried to get away. However, J.P. prevented him from doing so. Rodriguez then repeatedly stated he was going to kill J.M. and hit him several times with a bar stool. He fell, and Rodriguez again hit him repeatedly with the bar stool. Overall, Rodriguez hit his head, face, both arms, both shoulders, and back. Rodriguez only

17.

stopped hitting him when the bar stool broke into pieces. Photographs of J.M.'s injuries were introduced into evidence.

At the preliminary hearing regarding the 2022 charge, evidence was introduced that Rodriguez ignored multiple orders from correctional officers to return to his cell after a different cell door was opened. Instead, he told the occupant of that cell, A.C., " 'we can get this on right now.' " Eventually, A.C. came out of his cell and they both took a "bladed fighting stance." A.C. approached Rodriguez. However, before they began fist fighting, Rodriguez pulled out a weapon that looked like a plastic spoon that had been sharpened, and he attacked A.C. He repeatedly stabbed A.C. with the object. After the altercation, A.C. was bleeding from his head. He also had scrapes or puncture wounds on the left side of his ribcage and back.

Thus, evidence was introduced that Rodriguez initiated all three incidents, and that in all three incidents he used a weapon on an unarmed individual. Therefore, all three incidents had common characteristics. Moreover, both the 2018 case and the 2022 case had the identical charge of assault with a deadly weapon. Accordingly, the trial court properly joined the charges for trial. (*People v. Anderson* (2018) 5 Cal.5th 372, 388 ["The law prefers trying charged offenses together because doing so ordinarily promotes efficiency."].)

Second, Rodriguez argues that, even if the 2018 charges were appropriately joined with the 2022 charge, the risk of prejudice was so great that the trial court should have severed the charges. According to Rodriguez, "there was limited, if any, cross-admissibility between the two cases." Rodriguez further argues that there was a risk that the video of the 2022 incident "would affect the jurors' view, whether consciously or subconsciously, of Rodriguez as a violent person[.]" According to Rodriguez, this, combined with the weak evidence regarding what occurred during the 2018 incidents, prejudiced him.

18.

These arguments fail. As to cross-admissibility of the evidence in hypothetical separate trials, the trial court found that "an argument … can be made that [the evidence is] admissible under [Evidence Code section 1101[, subdivision ](b) to establish intent, plan, knowledge, or absence of a mistake or accident." This holding was not an abuse of discretion, especially as to intent.

"[T]here exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: '*The least degree of similarity ... is required in order to prove intent ....* In order to be admissible [for that purpose], the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " (*Soper*, *supra*, 45 Cal.4th at p. 776.) Here, as discussed above, the charges included similar conduct, including that Rodriguez initiated all three incidents, and that in all three incidents he used a weapon on an unarmed individual. Thus, the trial court's ruling did not fall outside the bounds of reason.[6]

Moreover, even if no evidence was cross-admissible, Rodriguez's argument still fails. In arguing prejudice, Rodriguez relies largely on what occurred during the trial. This is inappropriate. As discussed above, "[i]n determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.' " (*Soper*, *supra*, 45 Cal.4th at p. 774.) As it is Rodriguez's burden to make a clear showing of prejudice, and as he failed to discuss the evidence before the trial court when it made its ruling, this alone is fatal to his claim.

However, despite this failure, we have reviewed the preliminary hearing transcripts related to the 2018 charges and the 2022 charge, and we do not see a

---

[6] We note that at least some of Rodriguez's arguments to the contrary rely on evidence that was only introduced after the trial court made its ruling, in contravention of the applicable legal standard.

19.

substantial danger of prejudice created by trying the cases together. All three incidents involved similar behavior, including Rodriguez using a weapon on an unarmed victim, resulting in injuries. The fact that there was a video of the 2022 incident was not particularly likely to inflame the jury against Rodriguez and have a "spill-over effect" to the 2018 charges. This is especially true given the similarity between the incidents and that pictures of the injuries related to the 2018 incidents were also introduced, which, according to the evidence, included a throat slit in multiple places, a bite mark, bruising under the eyes, a broken nose, and a thumb that was out of its socket. (See, e.g., *Soper*, *supra*, 45 Cal.4th at p. 759 ["The homicides at issue … are similar in nature and equally egregious—hence neither, when compared to the other, was likely to unduly inflame a jury against [the] defendant."].)

As to the strength of the cases, both the 2018 case and the 2022 case were strong. As to the 2022 case, at the preliminary hearing, the prosecutor introduced both testimony and a video showing that Rodriguez attacked A.C. with a white object.

As to the 2018 case, both victims testified that they were attacked, and photographs of the injuries they each received from the alleged attacks were introduced into evidence. Additionally, both victims identified Rodriguez as their attacker. As to the incident involving R.C., the prosecutor also introduced evidence that the vehicle matching the description given by R.C. was found. There was blood on and in the passenger side of that vehicle. There was also a bloody sunshade that had cuts to it in the vehicle, as well as a canister of pepper spray and Rodriguez's ID card.

Thus, both cases were strong, and any minor differences between the cases does not change this result. (See *Soper*, *supra*, 45 Cal.4th at p. 781 ["between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges"].)

20.

In addition to the fact that both cases were strong and none of the charges were likely to inflame the jury,[7] "a single trial of properly joined charges promotes important systemic economies. Whenever properly joined charges are severed, the burden on the public court system of processing the charges is substantially increased." (*Soper*, *supra*, 45 Cal.4th at p. 782.) Accordingly, even if no evidence was cross-admissible, it was not an abuse of discretion for the trial court to conclude that the any potential prejudice to Rodriguez was outweighed by the benefits to the state.

In arguing to the contrary, Rodriguez relies on *People v. Earle* (2009) 172 Cal.App.4th 372. In *Earle*, the defendant was charged in one case with indecent exposure, and in another case, sexual assault. (*Id.* at p. 378.) The trial court consolidated the cases for trial and denied the defendant's motion to sever. (*Ibid.*) In analyzing the evidence, the appellate court found that proof of the indecent exposure charge was strong, proof of the sexual assault case "was considerably weaker," and the "charges arose from entirely distinct and dissimilar incidents. (*Ibid*.)" The appellate court also found that, "in the context of the assault case here the exposure charge may well have had the potential to inflame the jury against the defendant in an unusual and peculiar manner …. As a repellent sexual aberration—what is still widely known as a 'perversion'—the indecent exposure would naturally incline the jury to view defendant as a kind of freak, a pariah, a 'pervert.' This would at a minimum reduce the jurors' natural compunction about convicting him of the more serious offense on questionable evidence, as well as impair[] their ability to view evidence of that offense objectively." (*Id.* at p. 401.)

However, *Earle* is readily distinguishable. First, none of the charges in this case involved a "repellent sexual aberration" or any similar behavior. Moreover, as discussed above, all three incidents in this case contain substantial similarities, the video evidence

---

[7] Neither case involved a capital offense, so that consideration is not relevant here.

was not particularly likely to inflame the jury, and the evidence supporting all three incidents was strong.

Finally, Rodriguez argues that even if the trial court's decision to try the cases together was not an abuse of discretion at the time it was made, "Rodriguez's judgment must be reversed since the joinder actually resulted in gross unfairness, amounting to a denial of due process."

However, Rodriguez fails to meet his high burden of showing gross unfairness that deprived him of due process. As discussed above, video of the 2022 incident was not particularly likely to inflame the jury against Rodriguez. Additionally, Rodriguez does not identify anything that occurred at trial that might change the analysis, nor do we see anything. For example, Rodriguez does not argue, nor do we see in the record, that the prosecutor urged the jury to convict Rodriguez of any of the 2018 charges based on the video. (See *People v. Grant* (2003) 113 Cal.App.4th 579, 583, 586–587, 589–591 [finding a due process violation where a trial court properly denied a motion to sever a burglary charge from a possession of stolen property charge, in part because the evidence was not cross admissible but the prosecutor "urged the jury to draw the impermissible inference that defendant committed the burglary … based on the evidence that he knowingly possessed stolen computer equipment[.]"].)[8]

Moreover, while Rodriguez is correct that there were inconsistencies in the testimony of R.C. and J.M., the strength of the 2018 case only increased with the evidence presented at trial. The prosecutor once again produced the accounts of the victims, photographs of their injuries, and evidence that Rodriguez's ID card was found

---

[8] Rodriguez testified at the trial, and on appeal, Rodriguez relies on that testimony. However, Rodriguez does not cite to any authority, nor are we aware of any, suggesting that a defendant's testimony regarding accident or self-defense turns an otherwise strong case into a weak one such that an otherwise proper joinder becomes a due process violation.

in the vehicle that was covered in blood. However, the prosecutor also produced additional evidence supporting Rodriguez's guilt. As to the incident involving R.C., Rodriguez's girlfriend at the time testified that, on the day in question, Rodriguez was driving her vehicle. Her vehicle was eventually recovered, blood taken from the vehicle was tested, and a senior criminalist testified that the DNA profile "was the same as the reference profile of [R.C.]" Moreover, a latent print analyst testified that two fingerprints taken from the vehicle matched Rodriguez's fingerprints.

As to the incident involving J.M., the jury was also shown pieces of a broken bar stool, which were recovered near J.M.'s residence. The same senior criminalist tested two pieces of the bar stool. Both pieces tested positive for blood, and "[t]he results from the two apparent blood stains … were the same DNA profile, and that was the same as the reference profile of [J.M.]." The senior criminalist also performed an analysis on DNA from the bar stool pieces that was not blood, and neither J.M. nor Rodriguez could be eliminated as contributors to the mixture of DNA. Finally, the criminalist performed an analysis on a swab of blood taken from Rodriguez's hand on the day of the incident, and there were two major DNA contributors, Rodriguez and J.M.

In addition to being strong, the evidence related to each incident was both simple and distinct. And, "[a]ppellate courts have found ' "no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials." ' " (*Soper*, *supra*, 45 Cal.4th at p. 784.)

Therefore, based on the foregoing, Rodriguez's argument that the trial court abused its discretion and violated Rodriguez's right to due process by allowing the 2018 charges and the 2022 charge to be tried together fails.

23.

# III. The Trial Court Did Not Abuse Its Discretion or Violate Rodriguez's Right to Due Process by Ordering He be Shackled During Trial

Rodriguez argues that the trial court violated his right to due process and a fair trial by ordering that his non-writing hand be shackled during the trial. The People disagree.

## A. *Applicable Law*

"A trial court has broad power to maintain courtroom security and orderly proceedings." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269.) "However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, 'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' [Citation.] Similarly, the federal 'Constitution forbids the use of visible shackles ... unless that use is "justified by an essential state interest"—such as the interest in courtroom security—specific to the defendant on trial.' " (*People v. Lomax* (2010) 49 Cal.4th 530, 558–559 (*Lomax*).)

" 'In deciding whether restraints are justified, the trial court may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.' [Citation.] Although the court need not hold a formal hearing before imposing restraints, 'the record must show the court based its determination on facts, not rumor and innuendo.' [Citation.] The imposition of physical restraints without evidence of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion." (*Lomax*, *supra*, 49 Cal.4th at p. 559.)

### B. Standard of Review

" '[W]e will not overturn a trial court's decision to restrain a defendant absent "a showing of a manifest abuse of discretion." ' [Citation.] To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice[.]" ' " (*People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 390.)

### C. Additional Background

Prior to a jury being selected, the prosecutor requested that Rodriguez be shackled during the trial. On February 9 and February 14, 2023, the trial court held an evidentiary hearing on the request.

#### i. The Prosecutor's Evidence

Jason Quick, who was employed by the Madera County Sheriff's Office as the Jail Division Watch Three Sergeant, testified that Rodriguez had been incarcerated at the Madera County Jail several times, the most recent of which began in 2018. Throughout his time at the jail, Rodriguez was consistently violent and consistently noncompliant and violent with officers. When Rodriguez "[got] told, 'no,' or [did not] get what he want[ed], there tend[ed] to be an incident or an altercation that quickly follow[ed] afterwards." Rodriguez had held pass doors[9] hostage, lashed out at deputies, and lashed out at other inmates. He also threatened jail staff.

According to Quick, at the time of the hearing Rodriguez was housed at the jail's highest security level "[d]ue to his history of violence and noncompliance with jail staff."

---

[9] According to Quick, a pass door is a small rectangular opening in the cell door that allows food to be based through. Additionally, when there is an incident, an inmate can put his hands through the door so an officer can handcuff him.

In this housing, inmates are allowed out of their cells and in "the day room" 75 minutes per day. They are not allowed to be around other inmates, and whenever they are transported outside of their cell or module, they "are fully belly chained, [have] two pairs of handcuffs and leg bands on," and two officers are present.

Quick also testified regarding several instances when Rodriguez was noncompliant. On August 14, 2022, an officer informed Quick that he thought Rodriguez was smoking marijuana in his cell. Rodriguez was told to "cuff up," meaning to put his hands through the pass door so he could be handcuffed. While Rodriguez was not aggressive, he refused to comply. He also covered the pass door with his shirt and with his blanket to prevent pepper spray from entering his cell. Officers continued to tell Rodriguez to "cuff up," and he continued to refuse. At some point during the incident, Rodriguez told Quick to open the door so he and Quick could "handle this one on one." Quick perceived this as a threat. After a deputy deployed a round from the PepperBall launcher into Rodriguez's cell (which was caught by the blanket), Rodriguez submitted to handcuffs. After being placed in handcuffs, Rodriguez stated that he was "going to get" "whoever was roughing [him] up." Quick also perceived this as a threat.

Quick also testified that, on another occasion, Rodriguez held his pass door hostage by placing his arms through the door and refusing to move them. This was a safety concern because, if a pass door is unsecured, an inmate inside the cell could manipulate the locking mechanisms on the door, grab nearby inmates, or grab nearby officers.

On another occasion, two doors in Rodriguez's housing module were opened. Defendant got into a fight with another inmate, during which Rodriguez stabbed him.[10]

---

[10] On cross-examination, Quick testified that a "porter" is an inmate worker that is allowed additional time outside of his cell. Quick also testified that porters clean the day room and the showers, violent inmates are not chosen as porters, and at the time of the hearing, Rodriguez was a porter.

Daryll Swengel was employed by the Madera County Sheriff's Office as a peace officer. At the time, he was the Sergeant of the Courts. It was his job to supervise all security at the courthouse. As part of this job, he communicated with the jail daily regarding inmates that were going to be brought to court.

Swengel was familiar with Rodriguez. Swengel personally observed Rodriguez "curse under his breath" or be defiant when a bailiff gave him an order he did not like. Additionally, on prior occasions when Rodriguez had been transported to court, jail staff notified Swengel that there had been "instances of violence at the jailhouse where corrections officers [had] been attacked …, defiance by [Rodriguez] and those sorts of things." Given this, it was Swengel's job to get "at least one or more extra deputies in the courtroom to assist in case there [were] any further issues." Moreover, jail staff put Rodriguez in "black box" handcuffs, which kept his "hands in a closer tighter position to restrict [his] movement even more than a normal inmate would be."

Jesus Martinez, who was employed by the Madera County Sheriff's Office in the Jail Division, testified that he had contact with Rodriguez while Rodriguez was incarcerated in the jail. Rodriguez would talk back or get loud, but Martinez "never really had to get physical with him."

Martinez also testified that, on January 9, 2020, Rodriguez got upset because a commissary worker started passing out commissary items at the housing module on the opposite side of Rodriguez's housing module, and he had to wait. Rodriguez expressed his distaste to the commissary worker and the correctional officer escorting her. The officer explained why they started at the opposite side, then asked Rodriguez if he was going to purchase anything. Rodriguez responded that he was talking to the commissary worker. The officer took this as a refusal to purchase items. He went to secure Rodriguez's pass door, but Rodriguez placed his hand through it. Rodriguez repeatedly

refused to remove his arm from the pass door. Martinez talked to Rodriguez and eventually got him to remove his arm from the door.

Alicia Valadez previously worked at the Madera County Jail as a correctional officer. Valadez testified that, on September 30, 2018, she heard an officer call for assistance over the radio, and she responded. When she arrived, approximately four officers were near Rodriguez's cell. Rodriguez was ordered to turn around so he could be placed in handcuffs, but he did not comply. He was angry and yelling. After Rodriguez repeatedly refused to comply, a correctional officer was directed to get the "PepperBall," which is a device that consists of bullets filled with PepperBall powder. Initially the officer was directed to "place" PepperBalls into the cell through the pass door. However, Rodriguez covered the pass door with clothes. The officer was then directed to throw PepperBalls under the cell door. This eventually worked, and Rodriguez was placed in restraints.

Valadez also testified that she looked up incident reports involving Rodriguez on the jail management system, and there were approximately 118 reports (this included incidents where Rodriguez was involved, even if he may have been the victim). There were incidents involving Rodriguez fighting other inmates, Rodriguez fighting an officer, weapons, and noncompliance.

Valadez also testified that, based on her interactions with Rodriguez, small things would trigger angry outbursts. And once he became upset, he would raise his voice and verbally abuse officers.

John Grayson was employed by the Madera County Sheriff's Office as a deputy sheriff. Grayson testified that, in June 2012, he received a call that several vehicles had been vandalized and items had been taken. Witnesses described a man who was "acting weird and frightening the hikers." One witness provided Grayson with the man's location. Grayson drove to that location and saw Rodriguez. Grayson got out of his vehicle and tried to talk to him. In response, Rodriguez went back to his vehicle and put

28.

his hand on the floorboard while Grayson was ordering him to stop. Grayson thought Rodriguez was reaching for a weapon, so he pointed his firearm at Rodriguez and told him to show his hands. Rodriguez complied, but he screamed and cursed at Grayson.

Grayson then ordered Rodriguez to drop to his knees, but Rodriguez advanced toward Grayson and continued cursing and screaming. Rodriguez "made a weird roar" and reached toward Grayson's firearm. Grayson took a step forward and threatened to kill Rodriguez. In response, Rodriguez ran back to his vehicle. Grayson told him to stop and to get out of the vehicle, but Rodriguez did not comply. Grayson then pepper sprayed Rodriguez, but he was still able to drive away.

Grayson followed Rodriguez in his patrol vehicle. Eventually Rodriguez began to stop, jumped out of his vehicle, and ran into a forest. Rodriguez was located four or five hours later.

In addition to witness testimony, the prosecutor submitted several of the incident reports into evidence. The prosecutor also requested that the trial court take judicial notice of the preliminary hearing transcripts in case Nos. MCR060295A and MCR063100, and the trial court reviewed these transcripts. In case No. MCR063100, the court had found sufficient cause to believe Rodriguez battered two custodial officers in 2019. In case No. MCR060295A (originally case No. MCR073546), a different trial court had found sufficient cause to believe that Rodriguez assaulted another inmate with a deadly weapon in 2022.

### ii. Rodriguez's Evidence

Logan Majeski was employed by the Madera County Sheriff's Office as a deputy sheriff. Majeski testified that in late 2022 he was assigned to the maximum security unit at the Madera County Jail. At some point, he inadvertently opened A.C.'s cell door from the control room. Rodriguez was in the day room at the time. However, he did not attack A.C. Instead, he went back to his cell and closed the door.

### iii. Trial Court's Ruling

After receiving evidence and hearing argument from the parties, the trial court ruled as follows:

> "During his incarceration, Mr. Rodriguez has been involved in two violent attacks – including assaults on two correctional officers and the stabbing of another inmate. The stabbing occurred with the use of a jail-made weapon. Mr. Rodriguez has failed to comply with – consistently failed to comply with the rules of the jail – including having contraband in the form of marijuana on at least two incidents.

> "On numerous occasions, Mr. Rodriguez has threatened to harm correctional officers and challenged them to fights. His disruptions and refusal to obey the rules of the jail required the correctional officers on several occasions to deploy [pepper] spray and PepperBalls to obtain his compliance.

> "It appears to the Court that others in Mr. Rodriguez's presence are at risk when Mr. Rodriguez is not shackled. This is apparent by his [2022] attacks on the other – on another inmate while housed in maximum security at the jail. There's no less restrictive means of protecting the safety of those in the courtroom than to shackle Mr. Rodriguez. The attacks on correctional officers, attacks on fellow inmates, threats made to correctional officers, the manufacture of a jail-made weapon, noncomplying conduct at the jail – including possessing contraband in the form of marijuana – indicate that Mr. Rodriguez is just not going to follow the rules.

> "And when things don't cut his direction, he becomes upset to the point where he becomes, at a minimum, verbally abusive and on occasion has become physically abusive; and I think it indicates a compelling manifest need to require that Mr. Rodriguez be shackled during the trial."

After determining that Rodriguez should be shackled, the trial court turned to "the form that the shackles are going to take." Rodriguez argued that only his feet should be shackled.

30.

Ultimately, the trial court ordered that "soft shackles"[11] be used on Rodriguez's feet and his non-writing hand.

### D. Analysis

As summarized above, evidence (not just rumor or innuendo) was presented that Rodriguez posed a safety risk at the proceedings and that he was likely to disrupt them if he was not shackled.[12]

As to whether Rodriguez posed a safety risk, there was evidence that in 2019, while Rodriguez was in jail, he battered two correctional officers. There was also evidence that, in 2022, he attacked another inmate with a weapon. Finally, there was evidence that on August 14, 2022, he threatened to harm a correctional officer.

As to his disruptiveness, evidence was presented of multiple occasions where Rodriguez would become disruptive, including by preventing officers from closing his pass door, usually when things were not going his way. On some of these occasions, including one that occurred on August 14, 2022, Rodriguez would not comply with orders from correctional officers until after force, in the form of a PepperBall launcher, was used.

Given this evidence, the trial court could have reasonably ordered that both Rodriguez's hands and feet be shackled, to prevent a violent incident and to prevent disruptive conduct. However, instead the court ordered that soft shackles be used, and

---

[11] Swengel testified that soft shackles "are velcro straps. They're able to lock, and they will be soundless and not visible and can be underneath the clothes."

[12] To the extent Rodriguez asserts that prior violent or disruptive conduct must have occurred in the courtroom, or that there must be direct evidence of Rodriguez's intent to be violent or disruptive in the courtroom, Rodriguez is incorrect. (See, e.g., *People v. Lewis & Oliver* (2006) 39 Cal.4th 970, 1031 [the required showing of manifest need "is satisfied by evidence that the defendant has threatened jail deputies, possessed weapons in custody, threatened or assaulted other inmates, and/or engaged in violent outbursts in court"].)

that his writing hand remain free.  Accordingly, the trial court's order did not fall outside the bounds of reason.[13]

## DISPOSITION

The judgment is affirmed.

FAIN, J.[*]

WE CONCUR:

HILL, P. J.

PEÑA, J.

---

**[13]** Rodriguez is correct that some evidence presented suggested that he would not be violent or disruptive, including that he was a porter and that in late August of 2022 he had another chance to attack A.C. but did not do so.  However, even if, in light of this evidence, the trial court's ruling was "debatable," that is insufficient for us to find an abuse of discretion.  (*People v. Bryant, Smith & Wheeler*, *supra*, 60 Cal.4th at p. 390.)

[*] Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.